JB

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09-CR-362-1

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) DEFERRED PROSECUTION AGREEMENT |
| | ) |
| SIRCHIE ACQUISITION COMPANY, LLC | ) |

1.  Sirchie Acquisition Company, LLC, a Delaware limited liability company ("SA" or the "Company"), by its undersigned attorneys, pursuant to authority granted by its Board of Managers, and the United States Attorney's Office for the Eastern District of North Carolina ("USAO EDNC"), have entered into this Deferred Prosecution Agreement (the "Agreement").  Except as specifically provided below, the Agreement shall be in effect for a period of 36 months from the later of (a) the date this Agreement is accepted by the United States District Court for the Eastern District of North Carolina (the "Court") and (b) the date the Company Denial Order (as defined below) is issued by the United States Department of Commerce.

2.  The USAO EDNC has informed SA that it will file, with a request for temporary sealing, a Criminal Information in the United States District Court for the Eastern District of North Carolina. The Criminal Information will charge SA, as a successor-in-interest, with responsibility for a violation of the terms of a Denial Order imposed by the United States Department of Commerce on the President/CEO/majority stockholder of SA's corporate predecessor.  The Denial Order was part of the resolution of a criminal investigation of both SA's corporate predecessor and the predecessor's President/CEO/majority stockholder. The Denial Order referenced herein was specifically applicable to the President/CEO/majority stockholder. SA's liability derives from the fact that it is a successor-in-interest to its corporate predecessor, Sirchie Finger Print Laboratories, Inc., a New Jersey corporation ("Sirchie"), which was complicit in violations committed by its President/CEO/majority stockholder.[1]  The Denial

---

[1] On January 15, 2008, SA acquired substantially all of the assets of Sirchie pursuant to an Amended and Restated Stock and Asset Purchase Agreement, dated September 12, 2007, (the

1

Order was published in the Federal Register on September 28, 2005, by the United States Department of Commerce pursuant to the Export Administration Regulations (EAR). This Denial Order barred the President/CEO/majority stockholder of SA's corporate predecessor from having any direct or indirect involvement in the export of items subject to the EAR from the United States. The violation of an order issued under the EAR is a violation of the International Emergency Economic Powers Act (IEEPA), Title 50, United States Code, Sections 1701-1705 and the Export Administration Regulations (the EAR, specifically Title 15, Code of Federal Regulations § 764.2 (b)). Title 50, U.S.C. App. § 1705 sets forth criminal penalties for knowingly and willfully violating or conspiring to violate any provision of the IEEPA.

3. SA and the United States agree that, upon the filing, with a request for temporary sealing, of the Criminal Information in accordance with the preceding paragraph, this Agreement shall be publicly filed in the United States District Court for the Eastern District of North Carolina.

4. In light of SA's remedial efforts to date, some of which are outlined below, and its willingness to:

      a. Acknowledge responsibility for the violation of the Denial Order committed by its corporate predecessor;

      b. Continue to cooperate with the United States and its governmental regulatory agencies regarding the criminal investigation underlying the Criminal Information;

      c. Employ on an on-going basis an Independent Compliance Monitor (as detailed in Paragraph 8) to oversee future export activity;

      d. Enter into a Settlement Agreement, dated on or about the date hereof, with the Bureau of Industry and Security, United States Department of Commerce, relating to civil penalties for the conduct described in the Criminal Information and Statement of Facts (the "Settlement Agreement" a copy of which is attached as Attachment C), which Settlement Agreement, to become effective must be

---

"Purchase Agreement"). The conduct underlying the Criminal Information occurred prior to January 15, 2008.

2

approved in an order entered by the Assistant Secretary of Commerce for Export Enforcement (the "Company Denial Order"); and

e. Consent to the payment of $12.6 million as detailed in <u>Attachment A</u>, the United States shall not during the term of this Agreement, except as contemplated by Paragraphs 17 and 18: (i) bring any criminal or civil case against SA or any affiliate of SA or any of their respective equity holders, directors, managers, officers, consultants or employees (other than any such equity holder, directors, managers, officers, consultants, or employees who were ever employed by Sirchie or its affiliates prior to January 15, 2008) related in whole or in part to a violation of export laws (including the IEEPA or EAR) or based on any such conduct that may have occurred prior to the date of this Agreement; (ii) use any information related to the conduct described in the Criminal Information or the Statement of Facts against any of the foregoing in any criminal or civil proceeding; or (iii) revoke SA's exporting privileges under the Company Denial Order. If the Court does not accept this Agreement, or if the Settlement Agreement is not approved through entry of the Company Denial Order, then (A) this Agreement shall be null and void, and the parties will revert to their pre-Agreement positions and may proceed as each deems appropriate, and (B) nothing herein shall be used against any party hereto or otherwise be admissible in any criminal or civil proceeding based in whole or part on the conduct described in the Criminal Information or the Statement of Facts. Nothing in this paragraph shall preclude the bringing of a civil action brought in the name of the United States to recover a monetary or civil penalty not inconsistent with the terms of the Settlement Agreement between SA and the United States Department of Commerce.

5. SA, as a successor-in-interest, has made substantial efforts to ensure its compliance with federal law and regulation relative to export activity. Steps taken to date include:

a. Without prompting by the United States, SA has banned its corporate predecessor's President/CEO/majority stockholder from its

3

corporate facilities and any participation in the export activity aspect of its on-going operations. In addition, SA has agreed that, although it is a party to a consulting agreement with its corporate predecessor's President/CEO/majority stockholder, SA will not request or use any consulting services under such consulting agreement or otherwise employ or engage its corporate predecessor's President/CEO/majority stockholder as an employee or agent of SA during the term of this Agreement. SA has also agreed that during the term of this Agreement it will not make any payments to its corporate predecessor's President/CEO/majority stockholder under the consulting agreement absent a court ruling requiring it to do so. Nothing in this Agreement precludes SA from paying its corporate predecessor's President/CEO/majority stockholder or any other person for past services rendered before the date of this Agreement.

b.  SA has implemented an extensive company-wide export compliance and auditing program, including its export control procedures and policies, dated June 11, 2008, as modified or supplemented thereafter, a copy of which has been furnished to the Government. This new program includes a detailed checklist of compliance and reporting requirements required by federal regulatory authorities. Legal and other personnel are required to provide careful review and dedicated assistance to SA's operations on the issue of foreign-trade compliance.

c.  SA has committed to the retention of an Independent Compliance Monitor in accordance with this Agreement and instituting a company-wide export compliance training program to be implemented by this individual with the full support of SA. This training program will include, at a minimum, twice yearly refresher training. Among other aspects, the compliance program will include oversight of sales, marketing, shipping, production and pricing operations as they relate to exports and reports to the United States concerning all aspects of the program.

d.  SA will institute an employee whistle-blower "hotline" for its employees company-wide to report any perceived or suspected export compliance problems. Complaints and issues raised through this

4

process will be quickly brought to the attention of upper management as well as the Independent Compliance Monitor. This "hotline" will be accessible by e-mail as well as by telephone and written communication. The establishment and importance of this hotline will be reinforced in all relevant training efforts. SA has committed to immediate voluntary disclosures to the Independent Compliance Monitor and all relevant regulatory authorities of all export compliance issues reported through this hotline or through any other means.

e.    SA shall receive a credit against the aggregate $12.6 million in payments described in Attachment A for any and all of the costs and expenses incurred by it or any of its parent companies or other affiliates with respect to export and international trade compliance, up to a maximum amount of $1.5 million. These payments shall include, without limitation, the costs and expenses of preparing and implementing SA's export compliance program (even if incurred prior to the date of this Agreement), and the costs and expenses of retaining the Independent Compliance Monitor and other compliance personnel.

f.    SA has completed a review of the involvement, if any, of SA's current officers and employees, relative to violations of the Denial Order applicable to the President/CEO/majority stockholder of SA's corporate predecessor.

6.    SA shall maintain and continue to implement all aspects of its compliance program throughout the term of this Agreement subject to SA's ability, with the Government's consent, to modify or supplement such program to improve its effectiveness.

7.    Throughout the term of this Agreement, SA agrees to produce and provide, through the Independent Compliance Monitor, to the Department of Commerce and the USAO EDNC, a twice-yearly report of its compliance programs as well as any violations of this Agreement, the Company Denial Order or export laws which come to his attention. From time to time the Department of Commerce and the USAO EDNC may require supplements to such reports. SA agrees to provide such supplemental reports in a timely fashion and to take remedial action as to any violations or deficiencies discovered.

5

8. SA agrees that for the duration of this Agreement it will retain and pay the Independent Compliance Monitor referenced above for the purpose of monitoring SA's compliance with this Agreement, the Company Denial Order and export laws. Such Monitor shall be an individual experienced in foreign trade regulation and independent of SA's corporate structure or ownership. SA will propose one or more candidates to serve as such independent compliance monitor. The Government will retain the authority to approve or disapprove the candidate in its reasonable discretion. Both parties will proceed promptly and in good faith with this appointment process. The monitor shall:

      a.    Have access to all aspects of SA's exporting operations both foreign and domestic. Such access shall include the ability to interview, with or without others present at the Monitor's discretion, any and all employees, officers and directors and to review any and all documentation or data, in whatever form;

      b.    Be required to judge the effectiveness of SA's export compliance and record in writing and address all failures and deficiencies and make recommendations for improvement;

      c.    Be required on a twice-yearly basis and at least 45 calendar days prior to the scheduled expiration of this Agreement, a comprehensive written report as to all observations, findings, and recommendations relative to SA's export compliance efforts and the results thereof; and

      d.    Be responsive to any and all inquiries by the United States and the regulatory agencies in the interim between the issuance of written reports.

9. The Independent Compliance Monitor need not be given access to such portions of SA's internal documentation, data and communications which are protected by the attorney-client or work-product privilege. However, the assertion of any such privilege shall be noted in the Monitor's twice-yearly written reports and the Monitor's own communications and recommendations shall not be deemed subject to such privileges.

10. The Independent Compliance Monitor's twice-yearly report may be distributed to any governmental agency deemed appropriate by the USAO and/or the United States Department of Commerce. Absent the necessity of litigation concerning an alleged breach of this

6

Agreement or the Company Denial Order, or a Court Order, the Government will treat the Monitor's reports as "confidential commercial information" as that term is used in the Freedom of Information Act, as amended, 5 U.S.C. § 552, 22 C.F.R. Part 171.

11. By entering into this Agreement, SA, as successor-in-interest to Sirchie, accepts responsibility for the facts set forth in the Statement of Facts attached as <u>Attachment B</u> ("Statement of Facts") and incorporated by reference herein.

12. Furthermore, SA agrees that in the event that future criminal proceedings are brought by the United States through the USAO EDNC or any other prosecutorial entity of the United States or other federal regulatory authority for breach of this Agreement, SA will not contest the admissibility of the Statement of Facts in any such proceedings. Nothing in this Agreement shall be construed as an acknowledgment by SA that this Agreement, including the Statement of Facts, is admissible or may be used in any proceeding other than a proceeding brought by the United States or other federal regulatory authority in accordance with the terms of this Agreement.

13. SA agrees that it will not, and will cause its parent company and its and their respective present and future attorneys, directors, managers and officers not to make any public statement (i.e. press release, press conference, response to analysts, press reports, press inquiries or other similar statements) contradicting any aspect of the Statement of Facts or asserting that the violations committed by Sirchie or Sirchie's President/CEO/majority stockholder are not serious matters. Any such contradictory public statement may, in the sole discretion of the United States, be deemed a breach of this Agreement. The United States will in good faith consider whether to permit a retraction or correction by SA of such an offending statement or other remedial action to cure such a breach. The United States will notify SA of its decision as to whether it will permit such a cure within 30 days of learning of the breach. For the avoidance of doubt, this paragraph is not intended to apply to any statement (a) by any attorney, director, manager or officer of SA who was at any time prior to the date of this Agreement employed or retained by Sirchie, or (b) made in connection with any subpoena, discovery request, testimony, interview or other formal questioning in connection with any criminal or civil proceeding.

14. SA agrees that its continuing cooperation during the term of this Agreement shall include, but shall not be limited to, the following:

7

a.  Not engaging in or attempting to engage in any felonious criminal conduct.

b.  Delivering to the United States copies of all memoranda of interviews conducted of SA employees relating to the relevant Denial Orders. Such production obligation shall not extend to documentation protected by either the attorney-client or work-product privilege.

c.  The United States will maintain the confidentiality of the materials disclosed in Paragraph 14(b) and will not disclose them to any third party, except to the extent that the USAO EDNC determines, in its sole discretion, that disclosure is otherwise required by law or would be in furtherance of the discharge of the duties and responsibilities of the United States, including the prosecution of other individuals or entities. These restrictions are not intended to apply to reports by the Independent Compliance Monitor, the confidentiality of which is addressed in paragraph 10 above.

d.  Making available SA officers and employees and imposing no impediment to the availability of former officers and employees, to provide information and/or testimony at all reasonable times as requested by the United States, including sworn testimony before a federal grand jury or in federal trials, as well as interviews with federal law enforcement authorities. However, it is understood that the United States will not enforce this clause in such a manner as to interfere with any such individual's right to be represented by counsel.

e.  Providing testimony, certifications, and other information deemed necessary by the United States or a court to identify or establish the original location, authenticity, or other evidentiary foundation necessary to admit into evidence documents in any criminal proceeding, as requested by the USAO EDNC.

f.  SA agrees, if requested by the United States during the term of this Agreement, to call a meeting, on a date and place mutually agreed upon by SA and the United States, of management and other SA employees identified by the USAO EDNC for the

8

purpose of communicating the goals and expected effect of this Agreement.

15.    SA acknowledges and understands that its prior, ongoing and future cooperation are important factors in the decision of the USAO EDNC to enter into this Agreement, and SA agrees to continue to cooperate fully with the United States and with any other governmental agency designated by the United States, regarding any issue about which SA has knowledge or information.

16.    The United States may continue to investigate and at its discretion prosecute equity holders, employees, officers, consultants and directors of Sirchie including such employees, officers or directors whose employment continued with SA after its acquisition of substantially all of the assets of Sirchie. Notwithstanding the foregoing, and in addition to the matters addressed in Paragraph 4 above, the United States agrees not to prosecute any agent, employee, officer, manager or other representative of SA (other than those previously employed by Sirchie) or of any of its subsidiaries or affiliates occurring in whole or in part prior to the date of this Agreement or otherwise with respect to conduct that forms any basis of the Criminal Information or as set forth in the Statement of Facts.

17.    Should the United States determine that, during the term of this Agreement, SA knowingly and materially breached this Agreement, including committing any felonious criminal conduct as referenced in Paragraph 14(a), SA shall, in the discretion of the United States, thereafter be subject to prosecution for any federal crimes of which the United States has knowledge, including crimes relating to the matters set forth in the Statement of Facts and which are set forth in the Criminal Information filed in conjunction with this Agreement, and revocation of exporting privileges pursuant to the Company Denial Order.    If such prosecution results in an obligation by SA to pay any fines, penalties or other similar payments for conduct attributed to SA and taking place prior to the date of this Agreement, then SA shall receive a credit against such fines, penalties or other similar payments in an amount equal to the aggregate payments made pursuant to this Agreement.

18.    Should the United States determine that, during the term of this Agreement, SA knowingly and materially breached this Agreement, including committing any felonious criminal conduct as referenced in Paragraph 14(a), the USAO EDNC shall provide written notice to SA of the alleged breach and extend to SA a 30-day window of opportunity within which to make any late payment due hereunder, or, if the breach is not related to the payment of monies, to make a presentation to the United States to demonstrate that no breach

9

occurred, or, to the extent applicable, that the breach was not material or knowingly committed or that SA should for other reasons be permitted to cure such breach with specified remedial action. The parties further understand and agree that the determination whether SA has breached this Agreement rests solely in the discretion of the United States, and the exercise of such discretion by the United States under this Paragraph is not subject to review in any court or tribunal outside the Department of Justice. In the event of a breach of this Agreement that results in a prosecution of SA, such prosecution may be premised upon any information provided by or on behalf of SA to the United States at any time, unless otherwise agreed when the information was provided.

19. By entry into this Agreement SA expressly waives all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Eastern District of North Carolina, for the period that this Agreement is in effect.

20. By entry into this Agreement, SA also expressly waives the statute of limitations with respect to any crime that would otherwise expire during the term of this Agreement, and this waiver is knowing and voluntary and in express reliance on the advice of counsel.

21. Absent an early termination as referenced below, this Agreement shall expire 36 months after the date of its acceptance by the Court, except that, in the event that the USAO EDNC is conducting an ongoing investigation, prosecution or proceeding related to the facts set forth in the Statement of Facts, the provisions of Paragraphs 14(b), 14(d) and 14(e) regarding the Company's cooperation shall remain in effect until such investigation, prosecution or proceeding is concluded.

22. The United States agrees that if SA has complied in all material respects with this Agreement, the United States, within 30 days of the expiration or early termination of this Agreement, will move to dismiss with prejudice the Criminal Information filed pursuant to Paragraph 2. Except to the extent Paragraph 18 is implicated, upon the conclusion of the term of this Agreement, the Government agrees that it will not prosecute SA or any affiliate or subsidiary of SA, or any of their respective directors, managers, officers or employees (other than those who were ever employed by Sirchie), criminally or civilly, for conduct that forms the basis of the Criminal Information or the Statement of Facts or is based on export violations that may have occurred prior to the date of

10

this Agreement.

23. SA agrees that, if it sells or merges all or substantially all of its business operations as they exist as of the date of this Agreement to or into a single purchaser or group of affiliated purchasers during the term of this Agreement, it shall include in any contract for sale or merger a provision binding the purchaser/successor to the obligations described in this Agreement.

24. It is understood that this Agreement is limited to SA, and to the extent provided herein, its affiliates and subsidiaries, and the United States on behalf of the U.S. Department of Justice, and does not bind other federal, state or local authorities. However, the USAO EDNC will bring this Agreement, the cooperation of SA and its compliance with its other obligations under this Agreement to the attention of other prosecuting offices and/or regulatory authorities, if requested to do so. As used in this agreement, the terms "United States" and "Government" mean the USAO EDNC and for the purposes of paragraphs 6-8, 10 and 26 of this Agreement the United States Department of Commerce.

25. SA has agreed to the terms of this Agreement in part out of consideration of its prospects of recovering some or all of the agreed upon payments set forth in Attachment A from Sirchie's President/CEO/majority stockholder and/or certain other parties to the Purchase Agreement. In acknowledgment of this, the Government agrees that: Should the United States pursue the President/CEO/majority stockholder of SA's corporate predecessor, either criminally or civilly, the United States will not seek to attach, forfeit or otherwise seize the President/CEO/majority stockholder's interest in consulting fees that have not yet been paid to the President/CEO/majority stockholder nor any remaining ownership interest in SA held by the President/CEO/majority stockholder nor any other amounts payable to him by SA.[2]

26. The Government acknowledges that substantially all of the assets and properties of SA and its subsidiaries are subject to mortgages and security interests in favor of SA's lender, Branch Banking and Trust Company, a North Carolina banking corporation (BB&T) and any successors thereto. Accordingly the Government agrees that:

   a. SA's payments described in Attachment A are

---

[2]The parties acknowledge that the Department of Commerce has no statutory authority to attach, forfeit or otherwise seize as referenced in this paragraph.

11

currently unsecured and such payments will be subordinate to repayment in full of all SA's indebtedness and obligations to BB&T, including any replacement or refinancing thereof;

b.    Without the consent of BB&T, no portion of SA's payments may be paid during the existence of an event of default under SA's credit arrangements with BB&T or any replacement or refinancing thereof;

c.    All security interests and mortgages of BB&T on SA's assets and properties will have priority over any judgment liens or other rights the Government may hereafter acquire with respect to SA's assets or properties;

d.    SA has sought and obtained BB&T's consent to SA's payments as detailed herein and in Attachment A and agrees to provide a copy thereof to the USAO EDNC;

e.    If SA makes the initial $6.1 million of payments within 30 days after the latter of (i) the date this Agreement is accepted by the Court and (ii) the date the United States Department of Commerce issues the Company Denial Order, then the United States will not exercise any collection rights it may have against SA, its assets or properties for failure to pay the remaining payments described in Attachment A until irrevocable repayment in full of all of SA's indebtedness and obligations to BB&T including any replacement or refinancing thereof. This Agreement will not however be interpreted as a bar to criminal prosecution of SA or revocation of SA's export privileges under the Company Denial Order in accordance with paragraphs 17 and 18 above, and the parties hereto acknowledge that any such criminal prosecution or revocation of export privileges may give rise to an event of default under SA's credit arrangements with BB&T; and

f.    The subordination provisions described in this paragraph 26 may be further documented in a manner acceptable to both BB&T and the United States provided that, BB&T shall be an express third-party beneficiary of this paragraph even if no further documentation is executed and delivered. In addition this paragraph 26 may not be amended without the prior written consent of BB&T.

12

27. This Agreement, together with the attachments hereto, including the civil Settlement Agreement, constitutes the full and complete agreement between SA and the Government with respect to the resolution of the criminal investigation of this matter. No additional promises, agreements, or conditions have been entered into with respect to the resolution of the criminal investigation other than those set forth in this Agreement, and none will be entered into unless in writing and signed by the USAO EDNC, SA's counsel, and a duly authorized representative of SA. It is understood that the Government may permit exceptions to or excuse particular requirements set forth in this Agreement at the written request of SA, but any such permission shall be in writing and will not otherwise impact the validity of the Agreement. Nothing in this agreement will supercede or control the provisions of the Settlement Agreement entered into between SA and the United States Department of Commerce.

28. Notwithstanding anything to the contrary in this Agreement, SA may from time to time petition the USAO EDNC for an early termination of this Agreement, in which case, the USAO EDNC will evaluate such request in good faith taking into consideration SA's compliance as well as any other factors it deems relevant. Neither the expiration or early termination of either this Agreement, the Company Denial Order, or any portion thereof, shall have any effect on the other agreement or any portion thereof. SA acknowledges that the USAO EDNC is under no obligation to grant an early termination or explain its reasoning thereto.

AGREED TO:

REPRESENTATIVES OF SIRCHIE ACQUISITION COMPANY, LLC

_____
GARY L. MONROE
President and Chief Operating Officer
Sirchie Acquisition Company, LLC


_____
THOMAS C. MANNING
Counsel for Sirchie Acquisition Company, LLC


_____
JEFFREY D. LITLE
Counsel for Sirchie Acquisition Company, LLC


_____
JOSEPH W. CLARK
Counsel for Sirchie Acquisition Company, LLC

REPRESENTATIVES OF UNITED STATES

JOHN STUART BRUCE
Acting United States Attorney
Eastern District of North Carolina

_____
ROBERT J. HIGDON, Jr.
Chief, Criminal Division


_____
JAMES A. CANDELMO
Deputy Chief, Criminal Division, National Security Section

_____
JOHN S. BOWLER
Assistant U.S. Attorney, EDNC
Criminal Division, National Security Section

14

AGREED TO:

REPRESENTATIVES OF SIRCHIE ACQUISITION COMPANY, LLC

_____
GARY L. MONROE
President and Chief Operating Officer
Sirchie Acquisition Company, LLC

_____
THOMAS C. MANNING
Counsel for Sirchie Acquisition Company, LLC

_____
JEFFREY D. LITLE
Counsel for Sirchie Acquisition Company, LLC

_____
JOSEPH W. CLARK
Counsel for Sirchie Acquisition Company, LLC

REPRESENTATIVES OF UNITED STATES

JOHN STUART BRUCE
Acting United States Attorney
Eastern District of North Carolina

_____
ROBERT J. HIGDON, Jr.
Chief, Criminal Division

_____
JAMES A. CANDELMO
Deputy Chief, Criminal Division, National Security Section

_____
JOHN S. BOWLER
Assistant U.S. Attorney, EDNC
Criminal Division, National Security Section

14

AGREED TO:

REPRESENTATIVES OF SIRCHIE ACQUISITION COMPANY, LLC

_____

GARY L. MONROE
President and Chief Operating Officer
Sirchie Acquisition Company, LLC

_____

THOMAS C. MANNING
Counsel for Sirchie Acquisition Company, LLC

_____

JEFFREY D. VLITLE
Counsel for Sirchie Acquisition Company, LLC

_____

JOSEPH W. CLARK
Counsel for Sirchie Acquisition Company, LLC

REPRESENTATIVES OF UNITED STATES

JOHN STUART BRUCE
Acting United States Attorney
Eastern District of North Carolina

_____

ROBERT J. HIGDON, Jr.
Chief, Criminal Division

_____

JAMES A. CANDELMO
Deputy Chief, Criminal Division, National Security Section

_____

JOHN S. BOWLER
Assistant U.S. Attorney, EDNC
Criminal Division, National Security Section

14

AGREED TO:

REPRESENTATIVES OF SIRCHIE ACQUISITION COMPANY, LLC

_____

GARY L. MONROE
President and Chief Operating Officer
Sirchie Acquisition Company, LLC

_____

THOMAS C. MANNING
Counsel for Sirchie Acquisition Company, LLC

_____

JEFFREY D. LITLE
Counsel for Sirchie Acquisition Company, LLC

*Joseph W. Clark*

JOSEPH W. CLARK
Counsel for Sirchie Acquisition Company, LLC

REPRESENTATIVES OF UNITED STATES

JOHN STUART BRUCE
Acting United States Attorney
Eastern District of North Carolina

*John S. Bowler for*

ROBERT J. HIGDON, Jr.
Chief, Criminal Division

_____

JAMES A. CANDELMO
Deputy Chief, Criminal Division, National Security Section

*John S. Bowler*

JOHN S. BOWLER
Assistant U.S. Attorney, EDNC
Criminal Division, National Security Section

14

## ATTACHMENT A, AGREED FINES

SA agrees that, following the acceptance by the Court of this Agreement, it will make a total payment of $12.6 million as follows:

1.  $6.1 million to be paid within 30 days of the later of (a) the date the Court accepts the Agreement, and (b) the date the United States Department of Commerce issues the Company Denial Order (the later of such dates being the "Acceptance Date"), it being understood that $2.5 million of such $6.1 million will be paid directly to the United States Department of Commerce in accordance with the Settlement Agreement and Company Denial Order.

2.  $1.0 million payable on the 1st anniversary of the Acceptance Date.

3.  $1.0 million payable on the 2nd anniversary of the Acceptance Date.

4.  $3.0 million payable on the later of: i) the 3rd anniversary of the Acceptance Date and ii) February 1, 2012.

5.  $1.5 million to be expended on or before the end of the 36 month term of the Agreement as contemplated by Paragraph 5(e) of the Agreement.

6.  None of SA's fines will accrue interest unless paid more than 30 days past their due date, in which case a late payment shall begin to accrue interest at the rate of 5% per annum until paid in full.

15

## ATTACHMENT B, STATEMENT OF FACTS

### Export Controls

1. The Export Administration Act (EAA) authorizes the Secretary of Commerce to prohibit or curtail the export of certain goods, technology, and software (collectively referred to hereinafter as "items") to protect the national security, foreign policy, nonproliferation, and short supply interests of the United States. The Secretary implements the authority provided by the EAA through the promulgation of the Export Administration Regulations (EAR).

2. Although the EAA expired on August 20, 2001, the President through Executive Order 13222 of August 17, 2001 (3 C.F.R. 2001 Comp. p. 783 (2002)), which has been extended by successive Presidential Notices, the most recent being that of August 15, 2007 (72 Fed. Reg. 46137 (August 16, 2007)), continues the EAR in effect under the International Emergency Economic Powers Act, 50 U.S.C. § 1701-1705(IEEPA), including the President's authority to issue regulations under 50 U.S.C. § 1704. Both the EAA and IEEPA authorize investigations into violations of regulations issued to implement the authority of the relevant statute.

3. Violating an order issued under the EAR is a violation of the International Emergency Economic Powers Act (IEEPA, Title 50 United States Code, Sections 1701-1705) and the Export Administration Regulations (the EAR, specifically Title 15 Code of Federal Regulations §§ 764.2(a) and (b).) Title 50 U.S.C. App. § 1705 sets forth criminal penalties for knowingly violating or conspiring to violate any provision of the IEEPA. These penalties were recently enhanced by the President under Public Law No. 100-96

### Prior Conviction of Corporate Predecessor's President/CEO/Majority Stockholder

4. In April 2004, agents with the Department of Commerce Office of Export Enforcement (OEE) and Immigrations and Customs Enforcement executed a federal search warrant at the business facilities of Sirchie Finger Print Laboratories, Inc., a New Jersey corporation ("Sirchie"), located in Youngsville, North Carolina. This warrant was issued in support of an OEE investigation into Sirchie's illegal diversion of export controlled items to Hong Kong and the People's Republic of China (PRC). OEE's investigation eventually determined that Sirchie corporate officers, including its President/Chief Executive Officer ("CEO")/majority stockholder, created and

implemented a plan in which items, including fingerprint
detection technology, requiring licenses from the Department
of Commerce for export to Hong Kong and the PRC were exported
by Sirchie to a distributor in Italy for the purpose of
disguising their eventual shipment to Hong Kong and the PRC.
The President/CEO/majority stockholder had this diversion
scheme put in place specifically to evade U.S. export control
laws. At the conclusion of the investigation, OEE determined
that Sirchie's employees, as directed by
President/CEO/majority stockholder, had shipped approximately
$1.25 million in forensics items through this scheme. As a
result of his involvement in this diversion scheme, on
December 14, 2005, the President/CEO/majority stockholder
plead guilty in Federal District Court for the Eastern
District of North Carolina, to one count Criminal Information
charging an IEEPA violation (50 USC §§ 1702 and 1705(b)). He
was sentenced to 12 months probation and required to pay a
criminal fine of $850,000. The criminal Plea Agreement
pursuant to which he entered this plea was tied to a global
settlement negotiated with the President/CEO/majority
stockholder and his legal counsel by the U.S. Attorneys Office
and Office of Chief Counsel for the Department of Commerce
Bureau of Industry and Security. Global settlements are used
in export cases in order to simultaneously and efficiently
resolve both the criminal and civil enforcement aspects of a
case. At the President/CEO/majority stockholder's request,
the terms of both his criminal plea agreement and civil
settlement agreement were negotiated in tandem.

5.  In addition to his criminal penalties, the Bureau of Industry
    and Security (BIS) entered into a Settlement Agreement with
    Sirchie's President/CEO/majority stockholder. This agreement
    detailed the President/CEO/majority stockholder's 181
    violations of the EAR related to the aforementioned illegal
    export scheme. In exchange for BIS agreeing not to pursue
    administrative proceedings against him, the
    President/CEO/majority stockholder agreed to accept, among
    other penalties, the issuance of a Denial Order against him
    ("the individual Denial Order"). Section 766.25 of the EAR
    states that denial orders can be issued for a person or entity
    convicted of a criminal violation of the EAA or IEEPA.

6.  Under the terms of his individual Denial Order, for a period
    of five years from the date of entry of the Order (signed
    September 22, 2005 and published in the Federal Register on
    September 28, 2005), Sirchie's President/CEO/majority
    stockholder and, when acting for or on behalf of the
    President/CEO/majority stockholder, his representatives,
    agents, assigns or employees may not participate, directly or
    indirectly, in any way in any transaction involving any

commodity, software or technology...exported or to be exported from the United States that is subject to the Export Administration Regulations, or in any other activity subject to the Regulations, including, but not limited to:

"Applying for, obtaining or using any license, License Exception, or export control document; Carrying on negotiations concerning or ordering, buying, receiving, using, selling, delivering, storing, disposing of, forwarding, transporting, financing, or otherwise servicing in any way, any transaction involving any item exported or to be exported from the United States that is subject to the Regulations, or in any other activity subject to the Regulations; or Benefiting in any way from any transaction involving any item exported or to be exported from the United States that is subject to the Regulations, or in any other activity subject to the Regulations."

7. The Denial Order applicable to Sirchie's President/CEO/majority stockholder also states, in part, that no person may, directly or indirectly, do any of the following:

"Export or re-export to or on behalf of the Denied Person any item subject to the Regulations; Take any action that facilitates the acquisition or attempted acquisition by the Denied Person of the ownership, possession, or control of any item subject to the Regulations that has been or will be exported from the United States, including financing or other support activities related to a transaction whereby the Denied Person acquires or attempts to acquire such ownership, possession or control; Take any action to acquire from or to facilitate the acquisition or attempted acquisition from the Denied Person of any item subject to the Regulations that has been exported from the United States; Obtain from the Denied Person in the United States any item subject to the Regulations with knowledge or reason to know that the item will be, or is intended to be, exported from the United States."

8. Section 734.3 of the EAR defines the term "subject to the EAR", or subject to the Regulations. Under this section, items subject to the Regulations include (but are not limited to) all items in the United States or moving in transit through the United States from one foreign country to another and all U.S. origin items wherever located.

9. Section 734.3(b)(2) identifies a variety of items not subject

to the EAR, such as books, publications, phonograph records, sheet music and motion picture films. With the exception of items of this nature, practically any item exported from the United States that is not subject to the export controls of another U.S. government agency is "subject to the EAR."

10. Sirchie's President/CEO/majority stockholder signed this Settlement Agreement on September 19, 2005, and his individual Denial Order was made available to the public and published in the Federal Register as noted above. The President/CEO/majority stockholder is currently listed on the BIS Denied Persons List, which is readily accessible through the BIS Internet Website. Under the category Compliance and Enforcement/Lists to Check, viewers are advised that the Denied Persons List is a list of individuals and entities that have been denied export privileges and that any dealings with a party on this list that would violate the terms of the applicable denial order is prohibited. Exporters are expected to review this list prior to engaging in any export transaction in order to ensure that the transaction is not a violation of U.S. law.

11. Under the individual Denial Order the President/CEO/majority stockholder was permitted to own financial interests in companies that export as part of their business (including his financial interests in Sirchie); however, he was barred from "participat[ing], directly or indirectly, in any way in any transaction involving any [item]...exported or to be exported from the United States that is subject to the [EAR]." As a result of the same activities that brought about the President/CEO/majority stockholder's conviction, Sirchie, as a corporation, was subjected to administrative penalties issued by the Department of Commerce. Specifically, Sirchie was required to pay $400,000 in administrative fines, and was placed under a five year suspended denial order. Sirchie was allowed to continue exporting, with the provision that any subsequent violations of the EAR could lead to an actual denial of export privileges.

12. On January 15, 2008, Sirchie Acquisition Company, LLC, a Delaware limited liability company (SA) acquired substantially all of the assets of Sirchie pursuant to an Amended and Restated Stock and Asset Purchase Agreement, dated as of September 12, 2007, (the "Purchase Agreement") among SA, Sirchie, the President/CEO/majority stockholder and certain other parties. In connection with the transactions contemplated by the Purchase Agreement, SA offered employment to substantially all of Sirchie's employees and retained the President/CEO/majority stockholder as a consultant pursuant to

a written Consulting Agreement, dated January 15, 2008, (the "Consulting Agreement"). After the closing, these individuals, as employed by SA, continued with essentially the same duties they had been performing for Sirchie prior to the acquisition, except that the Consulting Agreement specifically limited the President/CEO/majority stockholder's consulting services to domestic operations and prohibited him from any involvement in exporting activities. On January 30, 2008, agents of the United States Department of Commerce exercised a search warrant of the business premises that SA acquired under the Purchase Agreement.

13. Subsequent to the entry of the individual Denial Order, and in direct contravention of its terms, the President/CEO/majority stockholder had repeatedly participated in the export of Sirchie products. He did so, among other things, by actively assisting in the setting of prices on products he and other senior members of Sirchie's management knew, or should have known, would be and were intended to be exported to foreign countries.

14. The evidence collected by the Government shows that the President/CEO/majority stockholder's conduct in violation of the Denial Order occurred principally during the period from February, 2006, to November, 2007.

15. The following are specific examples of the President/CEO/majority stockholder's continued direct involvement in exporting activities which occurred before January 15, 2008, that is, the date SA acquired substantially all of the assets of Sirchie pursuant to the Purchase Agreement, and occurred principally during the period from February 2006, to November 2007, and in violation of the Denial Order.

   a. On a Fax Cover Sheet dated February 22, 2006, the President and Co-Owner of S.A.F.E. Source, Inc. (SS), a company based in Raleigh, North Carolina, requested pricing from Sirchie's Director of International Sales. This pricing request was for "350-313M". 313M is identified in Sirchie product literature as a Professional Folding Magnifier. This document was eventually passed to the President/CEO/majority stockholder. Upon receiving the document, the President/CEO/majority stockholder handwrote "$10.00 net/net" below the request. At the time of this request, S.A.F.E. Source served as the Central and South American distributor for Sirchie products.

   b. On a Sirchie letterhead memo dated May 22, 2006, a

Sirchie employee advised the President/CEO/majority stockholder that a Sirchie employee "needs a quote for 250ea of a 28gm cyanoacrylate. Our cost is $1.24." This quote request was for a Sirchie customer in Taiwan. This memo was eventually passed to the President/CEO/majority stockholder. Upon receiving it, the President/CEO/majority stockholder handwrote "$3.75 net" below the request.

c.  In an electronic mail message dated October 11, 2006, an overseas customer of Sirchie located in Singapore asked an employee of Sirchie to "Please quote 110 sets each of the following model include delivery lead time, Ex-Work USA or CIF Shanxi Airport for their selection." The customer listed two Sirchie products, a KSS8900 Scan-N-Find Pocket Imager Kit and a KSS78, Krimesite Imager Direct View Kit. This document was eventually passed to the President/CEO/majority stockholder. Upon receiving it, the President/CEO/majority stockholder handwrote several pricing figures, including "$6,000", "$8,000", "$385.00" and "$4,584" on the right hand margin.

d.  On a Fax Cover Sheet dated November 20, 2006, the President and co-owner of SS advised a Sirchie employee that he "Need(ed) the best possible price for this tender." Attached to this fax sheet was a S.A.F.E. Source quotation list, identifying 30 Sirchie products, including Ninhydrin spray, reagents, latent print powders, ink rollers and fingerprint lifting tape. This document was eventually passed to the President/CEO/majority stockholder. Upon receiving it, the President/CEO/majority stockholder handwrote specific pricing figures next to 27 of the listed products.

e.  On a Sirchie letterhead memo dated March 8, 2007, the President/CEO/majority stockholder was advised that Sirchie's Director of International Sales, on behalf of a customer, "has a request for quotation for 8750ea of the EZID200 ceramic fingerprint pads. Our cost is $3.92ea. Our vendor would not budge on the price of the stone, $1.84ea. He said that our price should already be more for the quantities that we buy. Delivery on the stones would be 8 weeks." This quote request was for a Sirchie customer in France. This memo was eventually passed to the President/CEO/majority stockholder. Upon receiving it, the President/CEO/majority stockholder handwrote "$7.85, 12 wk delivery" below the request.

f.  In an electronic mail message dated March 12, 2007, an

was for a Sirchie customer in the United Kingdom. This
memo was eventually passed to the President/CEO/majority
stockholder.     Upon     receiving     it,     the
President/CEO/majority stockholder handwrote "$4950.00"
and "$4256.00" next to each powder description.

**ATTACHMENT C, SETTLEMENT AGREEMENT**

[see attached]

**ATTACHMENT C, SETTLEMENT AGREEMENT**

[see attached]

ORIGINAL

UNITED STATES DEPARTMENT OF COMMERCE
BUREAU OF INDUSTRY AND SECURITY
WASHINGTON, D.C. 20230

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| Sirchie Acquisition Company, LLC | ) |
| 100 Hunter Place | ) |
| Youngsville, NC 27956 | ) |
| | ) |
| Respondent. | ) |
| | ) |

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made by and between Respondent,

Sirchie Acquisition Company, LLC ("SA"), a Delaware limited liability company, of

Youngsville, NC, as successor to Sirchie Fingerprint Laboratories, Inc. ("SFPL"), a New

Jersey corporation,[1] and the Bureau of Industry and Security, U.S. Department of

Commerce ("BIS") (collectively, the "Parties"), pursuant to Section 766.18(a) of the

Export Administration Regulations (currently codified at 15 C.F.R. Parts 730-774 (2008))

(the "Regulations"),[2] issued pursuant to the Export Administration Act of 1979, as

amended (50 U.S.C. app. §§ 2401-2420 (2000)) ("Act").[3]

---

[1]  On January 15, 2008, SA acquired substantially all of the assets of SFPL pursuant to
an Amended and Restated Stock and Asset Purchase Agreement, dated September 12,
2007. The charges that are the subject of this Agreement occurred prior to SA's
acquisition of SFPL's assets on January 15, 2008, and SA is liable as SFPL's successor.

[2]  The charged violations occurred in 2006 and 2007. The Regulations governing the
violations at issue are found in the 2006 and 2007 versions of the Code of Federal
Regulations (15 C.F.R. Parts 730-774 (2006-2007)). The 2008 Regulations establish the
procedures that apply to this matter.

[3]  Since August 21, 2001, the Act has been in lapse and the President, through Executive
Order 13222 of August 17, 2001 (3 C.F.R., 2001 Comp. 783 (2002)), which has been
extended by successive Presidential Notices, the most recent being that of August 13,
2009 (74 Fed. Reg. 41,325 (August 14, 2009)), has continued the Regulations in effect

WHEREAS, BIS has notified SA of its intention to initiate an administrative

Proceeding against SA, pursuant to the Act and the Regulations;

WHEREAS, BIS has issued a proposed charging letter to SA that alleged that

SA committed ten (10) violations of the Regulations, specifically:

**Charges 1-10:    15 C.F.R. § 764.2(b): Aiding and Abetting Violations of a Denial Order Issued Under the Regulations**

On 10 occasions between in or about February 2006 and in or about November 2007, SA aided and abetted actions taken to evade the order denying the export privileges of John Carrington, an order issued under the Regulations. On September 22, 2005, an order was issued denying John Carrington's export privileges for a period of five years (see 70 Fed. Reg. 56,630 (Sept. 28, 2005)), and said denial order remained in effect at the time of these actions. The denial order prohibited John Carrington from participating, directly or indirectly, in any way in any transaction involving any item subject to the Regulations exported or to be exported from the United States. SA, inter alia, provided to John Carrington requests for price quotes for items to be exported that were subject to the Regulations, received pricing information from John Carrington, and engaged in export transactions involving these items. In so doing, SA committed 10 violations of Section 764.2(b) of the Regulations.

WHEREAS, SA has reviewed the proposed charging letter and is aware of the

allegations made against it and the administrative sanctions which could be imposed

against it if the allegations are found to be true;

WHEREAS, SA fully understands the terms of this Agreement and the Order

("Order") that the Assistant Secretary of Commerce for Export Enforcement will issue if

he approves this Agreement as the final resolution of this matter;

WHEREAS, SA enters into this Agreement voluntarily and with full knowledge

of its rights;

---

under the International Emergency Economic Powers Act (50 U.S.C. §§ 1701-1707) ("IEEPA").

WHEREAS, the Parties enter into this Agreement having taken into consideration a deferred prosecution agreement that SA has agreed to enter into with the U.S. Attorney for the Eastern District of North Carolina in a related criminal case;

WHEREAS, SA states that no promises or representations have been made to it other than the agreements and considerations herein expressed;

WHEREAS, SA neither admits nor denies the allegations contained in the proposed charging letter;

WHEREAS, SA wishes to settle and dispose of all matters alleged in the proposed charging letter by entering into this Agreement; and

WHEREAS, SA agrees to be bound by the Order, if entered;

NOW THEREFORE, the Parties hereby agree as follows:

1. BIS has jurisdiction over SA, under the Regulations, in connection with the matters alleged in the proposed charging letter.

2. The following sanction shall be imposed against SA in complete settlement of the alleged violations of the Regulations relating to the transactions specifically detailed in the proposed charging letter:

        a. SA shall be assessed a civil penalty in the amount of $2,500,000, all of which shall be paid to the U.S. Department of Commerce within 30 days from the date of the Order.

        b. The timely payment of the civil penalty agreed to in paragraph 2.a. is hereby made a condition to the granting, restoration, or continuing validity of any export license, permission, or privilege granted, or to be granted, to SA.

c.      For a period five years from the date of entry of the Order, SA, its

successors or assigns, and, when acting for or on behalf of SA, its

officers, employees, representatives, or agents ("Denied Person")

may not participate, directly or indirectly, in any way in any

transaction involving any commodity, software or technology

(hereinafter collectively referred to as "item") exported or to be

exported from the United States that is subject to the Regulations,

or in any other activity subject to the Regulations, including, but

not limited to:

i.      Applying for, obtaining, or using any license,

License Exception, or export control document;

ii.      Carrying on negotiations concerning, or ordering,

buying, receiving, using, selling, delivering, storing, disposing of,

forwarding, transporting, financing, or otherwise servicing in any

way, any transaction involving any item exported or to be exported

from the United States that is subject to the Regulations, or in any

other activity subject to the Regulations; or

iii.      Benefitting in any way from any transaction

involving any item exported or to be exported from the United

States that is subject to the Regulations, or in any other activity

subject to the Regulations.

d.      BIS agrees that, as authorized by Section 766.18 (c) of the

Regulations, the five-year denial period set forth in paragraph 2.c.

shall be suspended in its entirety for a period of five years from the

entry of the appropriate Order, and shall thereafter be waived,

provided that within 30 days of the date of the Order, SA pays the

monetary penalty of $2,500,000 in full, and provided that during

the period of suspension, SA has committed no violation of the Act

or any regulation, order or license issued thereunder.

e.  Upon the effective date of this Order, the provisions of the

September 21, 2005 settlement agreement entered into by BIS and

SFPL, and of the September 22, 2005 order relating to the denial of

SFPL's export privileges and the suspension of that denial of

export privileges, will no longer apply as to SA. As to all other

provisions and for all purposes other than the application of the

denial of export privileges and suspension of that denial of export

privileges to SA as successor to SFPL, the September 21, 2005

settlement agreement and the September 22, 2005 order remain in

effect.

3.  Subject to the approval of this Agreement pursuant to paragraph 8 hereof,

SA hereby waives all rights to further procedural steps in this matter (except with respect

to any alleged violations of this Agreement or the Order, if entered), including, without

limitation, any right to: (a) an administrative hearing regarding the allegations in any

charging letter; (b) request a refund of any civil penalty paid pursuant to this Agreement

and the Order, if entered; and (c) seek judicial review or otherwise contest the validity of

this Agreement or the Order, if entered.

4.      Upon entry of the Order, BIS will not initiate any further administrative proceeding against SA in connection with any violation of the Act or the Regulations arising out of the order denying the export privileges of John Carrington, and occurring on or before January 15, 2008.

5.      BIS will make the proposed charging letter, this Agreement, and the Order, if entered, available to the public.

6.      This Agreement is for settlement purposes only. Therefore, if this Agreement is not accepted and the Order is not issued by the Assistant Secretary of Commerce for Export Enforcement pursuant to Section 766.18(a) of the Regulations, no Party may use this Agreement in any administrative or judicial proceeding and the Parties shall not be bound by the terms contained in this Agreement in any subsequent administrative or judicial proceeding.

7.      Except as set forth in paragraph 2.e above, nothing in this Agreement modifies, supersedes, or terminates in any way any other settlement agreement or order entered into by BIS and any other party. Furthermore, nothing in this Agreement shall be construed as in any way limiting or precluding BIS from proposing or bringing charges, seeking remedies or sanctions, or taking any other action, as to any other person.

8.      No agreement, understanding, representation or interpretation not contained in this Agreement, including without limitation the Deferred Prosecution Agreement or any provision thereof, may be used to vary or otherwise affect the terms of this Agreement or the Order, if entered; nor shall this Agreement serve to bind, constrain, or otherwise limit any action by any other agency or department of the United States Government with respect to the facts and circumstances addressed herein.

9.    This Agreement shall become binding on the Parties only if the Assistant

Secretary of Commerce for Export Enforcement approves it by entering the Order, which

will have the same force and effect as a decision and order issued after a full

administrative hearing on the record.

10.    Each signatory affirms that he has authority to enter into this Settlement

Agreement and to bind his respective party to the terms and conditions set forth herein.

BUREAU OF INDUSTRY AND SECURITY          SIRCHIE ACQUISITION
U.S. DEPARTMENT OF COMMERCE              COMPANY, LLC

_Thomas Madigan_                          _Gary L. Monroe_

Thomas Madigan                            Gary L. Monroe
Director                                  President
Office of Export Enforcement

Date:  11/16/09                           Date:  Oct. 28, 2009